UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | : | Docket No. 19-00183 |
| vs. | : | November 2, 2020 |
| HOLDEN JAMES MATTHEWS, Defendant. | : | Lafayette, Louisiana |

REPORTER'S OFFICIAL TRANSCRIPT OF THE SENTENCING HEARING

BEFORE THE HONORABLE ROBERT R. SUMMERHAYS

UNITED STATES DISTRICT JUDGE

REPORTED BY: LARAE E. BOURQUE, RMR, CRR
Federal Official Court Reporter
800 Lafayette Street, Ste. 3103
Lafayette, LA 70501

A P P E A R A N C E S

| | |
|---|---|
| FOR THE PLAINTIFF: | JOHN LUKE WALKER<br>United States Attorney's Office<br>800 Lafayette Street, Ste. 2200<br>Lafayette, LA 70501 |
| | ALEXANDER VAN HOOK<br>United States Attorney's Office<br>300 Fannin St., Ste. 2101<br>Shreveport, LA 71101 |
| FOR THE DEFENDANT: | DUSTIN CHARLES TALBOT<br>Federal Public Defender's Office<br>102 Versailles Blvd., Ste. 816<br>Lafayette, LA 70501 |

P R O C E E D I N G S

(Call to order of the court.)

THE COURT: Please be seated.

This is a continuation of our hearing in Criminal Action Number 19-cr-183, the *United States of America vs. Holden Matthews*. We are taking up where we left off on Friday when the Court ordered that the hearing be continued.

Is there any reason -- I'll go ahead and take appearances from counsel at this time.

MR. WALKER: Luke Walker and Alexander Van Hook on behalf of the United States.

MR. TALBOT: Dustin Talbot on behalf of Mr. Holden Matthews who's with me at the table.

THE COURT: Any reason why sentencing should not proceed at this time?

MR. WALKER: There is none, Your Honor.

MR. TALBOT: No, Your Honor.

THE COURT: Okay. My understanding is that, Mr. Walker, on behalf of the government, you have an evidentiary offer that you would like to make at this time.

You may proceed.

MR. WALKER: Thank you, Your Honor.

Your Honor, I provided the defense as well as the Court two discs that contained phone calls. The first had contained a phone call that occurred on the 29th and a second disc that

contained two phone calls, one that occurred on the 28th and the other occurred on the 30th. I'm offering the first of those phone calls as Exhibit 8 and the next two calls as Exhibit 9.

THE COURT: Any objection?

MR. TALBOT: No objection, Your Honor.

THE COURT: They're admitted.

And, Mr. Walker, we're not playing those in court. True?

MR. WALKER: That is correct, Your Honor. I provided them to all parties so we would not have to.

THE COURT: And for the record, the Court will note that the Court was provided with copies of those files and the Court has listened to those files in their entirety.

MR. WALKER: Thank you, Your Honor.

THE COURT: At this point, the Court, when we left off on Friday, had outlined the 3553(a) factors and we took evidence. We are now closed as far as evidence and I will hear arguments, starting with the government, on the application of the 3553(a) factors as well as a sentencing recommendation.

Mr. Walker, you may proceed.

MR. WALKER: Thank you, Your Honor.

I'm kind of jumping to the end at the beginning. I'm letting the Court know. I'm letting you know what I ultimately intend to recommend to the Court.

I intend to recommend that he receive 30 years in prison from today. I know he has served 19 months in prison up to this point, and I, based on what you have heard at this sentencing as well as the facts of this case, submit that 30 years from today is a minimal sentence considering the facts and considering his circumstances.

The guidelines are a starting point. The 3553(a) is actually the endpoint. And in many ways the guidelines in this case are kind of a blunt instrument. I was thinking about that this weekend and I was thinking about when I went to college. I went to college in Virginia, and most Sundays I went to church, and the church I went to -- it was a great church. I loved it. I loved my pastor. It was a single-wide trailer and it had individual chairs and there was a pulpit in the front, and we would go in and we would hit our knees, and then when we got through, we would leave. If the defendant had burned down three single-wide trailers that were used as churches, he would be looking at the same time under the guidelines as he's looking at in this case.

The other thing the guidelines do, they look at a defendant's prior criminal history. Does he have prior convictions? And to a great degree, that controls what the guidelines are going to be. And in this case, though the defendant has no prior criminal history, you're able to go to 3553(a) and look at his characteristics and you're able to see

the insidious nature of his characteristics and that can have an effect on the Court in determining the appropriate sentence.

I was thinking about these churches this weekend. One of the churches was built in the 1890s. Two of the churches were built in 1873. That was eight years after the end of the Civil War. It's like you think about it. They're so old. And in 1873 there weren't any cars. So if you were wealthy, you might have a horse and you may even have a horse and buggy, but for the most part most people walked.

And you heard from one of the parishioners as she talked about the fact that when she was young, she would walk to church. She may walk miles to church, to go to church. It's like going to a place where you could worship. It was an effort. It was something you had to work to. It's something you had to want to do.

I get in my car and drive to church and it's about three minutes away, and I go to church and then I rush back home. Assuming the Saints are playing a 12:00 o'clock game, I can catch the kickoff, but the people who went to these churches, it was an effort for them. They had to want to and it was the center of their spiritual life. It was their sanctuary.

And I looked up "sanctuary" this weekend and a sanctuary is a refuge. It's a place where they can go and be safe and worship. And if you think about what these churches, how they survived, they had to deal with the post Civil War

reconstruction. They had to deal with all of the Jim Crow laws, all three of these churches did, but they couldn't survive Holden Matthews, his choice to destroy them.

And it's not just that they lost a building. They actually lost the things inside the building because a church is more than just a building. You heard about the damage done to the Bible and the miracle that the Bible wasn't completely destroyed.

And you know the records in the churches that are lost, and you think about, well, what records are those? It's things like the baptism records, marriage records, and death certificates of people who are buried behind the church. Those are the things that they lost. Those are the things that they lost as a result of what the defendant did. And they didn't just lose that as a result of his actions.

You heard Earnest Hines talk, and Earnest Hines, who's a brick builder, talked about the fact that at Mount Pleasant Baptist Church, he actually laid the bricks. It was a wood church and he put the bricks on the church. And he used to bring members of the church, young people, and they would sit on the steps, the bricks that he had laid, and he could talk to them about the benefit of working and the benefit not just to help others, but to help yourself and your life, and the defendant's actions took that away.

Perhaps the most devastating thing that the defendant's

actions did is you heard the parishioners are not coming back. A spiritual community is fragile, and his taking these churches, his destruction of these churches, these sanctuaries, affected the entire spiritual community. The loss the defendant heaped on these churches is irrevocable, and though they may rebuild churches, they can't be replaced. That's how serious this act was on his part. And it wasn't an act. It was three separate and distinct acts that he did, three separate acts of destruction that he did, and under 3553, when you're looking at the seriousness of the offense, that's the seriousness of the offense.

And then you look at the history and you look at the characteristics of the defendant, and I intend to address two things in this: One, his character traits that have been demonstrated, and, two, the likelihood, the potential that he could do this again.

You know that he bragged to his friends, people that by his -- he described as pagans, Luciferians, and Satanists. He bragged about the fact that he intended to burn down these churches.

Even more compelling are the videos that you've watched. He listened to -- as he's burning the churches, he videotaped it and he laughed. He was happy. It was like he was in rapture over the fact that he was destroying these places. It wasn't like he did it and showed any remorse as he did it. In

fact, it was obvious he was ecstatic as he did it.

And perhaps more disturbing are his words after the fact. You heard the psychologist testify, and what she said -- there were two things. At one point she said he said the reason why he did this, destroyed this history, destroyed these churches, was because he was mad at God because he didn't get what he wanted. In another place she said because he hated God. That's the history and characteristics of the person who you are faced with.

Let's talk about that psychologist. The defense put on a psychologist to talk about the fact that this defendant essentially was redeemable. She did three things. She did an IQ test, she did a PAI test, and she interviewed him.

On direct examination -- well, first of all, as it relates to the IQ test, on cross-examination she acknowledged it could be lower than actually his intelligence because it was given in a jail. She didn't say that on direct. She didn't say it in a report. For the first time on cross-examination she acknowledged, well, yeah, that could be registering lower than his true intelligence based on where I gave it to him.

The PAI she just threw out because the results of the test said it's possible that they may -- some of the symptoms may be exaggerated, not that it was, and the defense, in asking questions to her, said, so you threw it out? She said, that's right. He said, because it wasn't a valid result in that test,

and she said, absolutely, and it wasn't until cross-examination she acknowledged, well, no, it was actually a valid test.

And when you read -- I showed her parts of the test that talked about the fact that this person was going to be difficult to treat, it was going to be arduous, and that there would be reversals that you would have to deal with, reversals, an arsonist engaging in arson. Reversals are devastating.

The other thing she said in her test was that he wouldn't recidivate, that he was not the type of person who would do this again, and I want to talk about that because that's an issue. We have to protect all of us from him. And I'm going to tell you as I stand here right now, whether he's a recidivist or not, 30 years at a minimum is a just sentence, at a minimum.

But in her test, she said there are three things that I've found that determine if a person is likely to commit additional arson. One is he committed multiple arsons; two, was he abusing alcohol or drugs; and, three, did he have a high number of psychopathic traits. And I said, well, he committed three separate arsons, and she said, well, I didn't consider them three arsons. I thought of it just as a series of arsons. No. She had to acknowledge all of the scientific studies say if he's done it more than once -- and this was an arson a week, an arson a week, an arson. It's like they were spaced out over time. That's a character trait that dramatically increases the likelihood he will engage in this again.

The use of alcohol. She didn't say anything. It was in her report, but didn't say anything, but then when I asked her about it, she said, yeah, not only was he using alcohol. His mom tried to get him to stop and she couldn't. So he was using and abusing it. Another character trait.

And she then said he's not a psychopath, and the difficulty is this. I said, but the tests don't -- the scientific studies don't say he's a psychopath, that he has to be a psychopath to do it again. It says if he has a high number of psychopathic traits or a low number, and I went trait by trait that psychopaths have and she had to acknowledge that he had all those traits. And I will tell you what she said. She said but that was a moment in time back then, but, yes, he did have those traits.

I then brought up other traits that she hadn't put in her report.

Was he less highly socialized? That's a trait that's consistent with one who's going to do it again. And she said, yeah, he had that.

I said another one is poor school adjustment. Oh, well, yeah, he had that, too.

A personality disorder. The PAI said he had a number of them.

Relationship difficulties. He said the reason why he hated God is because of the difficulties he had in his

relationships.

And feelings of tension and excitement around the offense. You absolutely know that to be true.

The only thing she could say is that he had empathy. Of course, she hadn't heard the phone calls that we've now heard.

If you want to know the real Holden Matthews as you sit here, the real Holden Matthews are what he was saying to the Satanists ahead of time, what he was saying as he was burning down those churches, and what he said in those conversations to his parents just a week ago. That tells you who the real Holden Matthews is.

Reverend Sylvester said something in his allocution. He said, I forgive you. I forgave you right from the beginning, but if you -- if you want to redeem yourself, you have to be punished and you have to accept your punishment. That's what he said. And you know the sentencing guidelines are a lot like that because they talk about acceptance of responsibility, accepting the consequences of what you do.

You know in the phone call on October 28th, he said, you don't want to hear this. It's going to make you mad. And there was no -- and let me say this. You know later he said, oh, that was just a joke. You listen to that phone call and you listen to his voice and his words. He gives me 30, I'm going to escape one way or another. I don't give a -- and he used the "F" word a whole lot and he used them to and towards his parents. If

we can't get this pardoned, you're going to be visiting me after I've escaped is what he said.

Then there was the phone call with his father that happened on the 29th. I know what the father claimed. I have no idea if it's true. I don't know if the father actually had done the things he suggested he had, that is, that he had used his relationship with the sheriff to call in a favor, that he would be released from St. Landry during the day to do Cops and Kids, and his dad would bring him steak, and his mom would bring him sodas and chips during the day so that he could essentially live a life outside of the prison, and he could get to go ride in the police boats, too. That's what his father told him and then they read a Bible verse.

When the defendant was first brought here, when he was charged federally, there was a strong attempt made to make sure he could stay in St. Landry Parish, and this is the reason why he remained here. Judge Whitehurst ordered that he remain here in part because of the fact that we didn't know what would happen in St. Landry Parish.

What the father said is of less importance to me than what the defendant said in response in that phone call. In talking to his dad, he said, let me tell you something, Dad. I want a new mattress. These are too thin. His dad said, well, do you want a Serta? He said, that's exactly what I want. His father said, what are you trying to get? Do you want to live at

the Hilton in New York? He said, no, the Red Roof Inn will be fine.

Did you hear any laughing in that phone call as you were listening to it, Your Honor? No laughing. In fact, an aggressive, hostile person, an aggressive, hostile man telling what he wanted. He said, I don't want to go to Opelousas. You know why? Because they don't have the workout equipment that I want and I don't want to go to the third floor with those people. And if you put me in Cops and Kids, I don't want to have to wear the prison garb, and I'd rather stay in Lafayette because I like the women there better.

Does this sound like somebody who has accepted the fact that he is to be punished and accepting the punishment? In fact, both of those phone calls are exactly the opposite of it.

The October 30th phone call, after he came out of court, was just as disturbing. One, he said, you F'in fainted, talking to his mother. You've got to do it again Monday. And his mother said, well, I'm not going to be in court. He said, so only dad is going to be in court? He asked his mother, when you listen to that phone call, you've got to do it again Monday. It sounds like making a mockery of this court.

And even more devastating, the person who is empathetic, the person who cares about the victims in this case, what did he say about the victims in that phone call? He said, one of those bastards there said there would be justice today,

but he didn't get it. Talking about the victims again, he said, they're not Christians. They're not pastors. That's real talk.

He said, you F'in fainted and we didn't get the results we wanted. And it's not just what he was saying, but how he was saying it as he ridiculed the victims. You heard the fact that he took on that affect as he was talking. It was offensive.

The defense expert said that was a moment in time. That was a moment in time a year ago and he's different now. Those phone calls demonstrate it wasn't a moment in time. It demonstrates he's exactly the same person who burned down those churches. He's exactly the same person who did it because that's what he wanted to do. To redeem yourself, you have to do more than just be punished. You have to accept your punishment. That's how you redeem yourself. As has been demonstrated in the evidence submitted, he is not accepting his punishment. To this moment he is doing everything he can not to accept it.

The defense doesn't have to say anything to you and the defendant doesn't have to allocute. He doesn't have to say anything, but if he chooses to and talk about remorse and sadness, I would ask that you temper what he says with the things you've heard him saying when he didn't know you were listening, when he didn't know we were listening, because when you hear the things he was saying before he got up here to allocute, you see who the real Holden Matthews is.

There's another thing you should consider under 3553

and that is a need to afford adequate deterrence to criminal conduct. That's not talking about this defendant's criminal conduct. That's talking about other people's criminal conduct. That's talking about anybody else who would consider burning down either African-American churches or other churches. They need to know that if they choose to do that, the full weight of the federal government, the full weight of the United States of America, will come down upon them and the consequences will be dire.

I believe that if you sentence this defendant to 40 years, the Fifth Circuit, based on the record that has been submitted, would affirm that decision because that's not an unjust sentence. I'm asking for at least 30 years from today because I believe that's the minimum just sentence under the circumstances of this case.

(Pause in Proceedings)

THE COURT: Mr. Talbot, you may proceed when you're ready.

MR. TALBOT: Thank you, Your Honor.

Your Honor, we've all -- all the parties in this case have lived with it for quite sometime, and, Your Honor, you know through your dealings with this case that Mr. Walker and I have often agreed on things, but I cannot disagree more with his characterization of these phone calls and I'm going to start with that.

I'm going to start by talking about the phone calls, the three calls that the Court has listened to, and then I'm going to talk about the 3553(a) factors, and then finally I'll conclude by addressing Mr. Walker's request for a dramatic upward departure to 30 years.

Your Honor, this is a two-party adversarial hearing as is common in court, right, and what happens when a criminal defendant is in custody is every single phone call he makes to his family, to his support system, is recorded and accessible by the agents and the prosecutor. The only thing that's not accessible is his conversations with me.

And so rightfully so the Court -- it was brought to the Court's attention that Mr. Matthews used the word "escape" in a phone call and that's something that needed to be addressed and we all needed to listen to those phone calls, but the end result of this is that the Court has now listened to three phone calls that have taken place in the last five days by Mr. Matthews and you're basically hearing some inside baseball. You're hearing the defendant and his family in the most stressful period of their lives talk out things in the only way that Mr. Matthews can do that.

So it doesn't mean it's improper that the Court has heard these. It's properly admitted, but I'm just asking the Court to keep that in mind. We don't get to hear the inside baseball from the other party in this adversarial system and

their frustrations and their venting about things that may have happened or that they're scared may happen and I would like the Court to keep that in mind.

And, secondly, Mr. Matthews is in protective custody, which means that he is locked alone in a cell for 23 hours a day, and for one hour he gets out, maybe gets to go outside and can talk with his parents. And that means unlike all of us who talk to people all day, who text and get on social media and have those social interactions, he doesn't get any of that for 23 hours, and the one hour he's out, he gets to talk to a couple of guards and he gets to call his mom.

So that phone call, that's when he's got to get everything out. His fears, his frustrations, his anger, whatever it is that is building up, he's getting all of that out in that phone call and that's the phone call that we have to hear. Obviously there are things in there that I wished Mr. Matthews hadn't said, right, but he's trying to get things out that we all do. All of ours just doesn't get aired in front of everybody.

And so let's talk about these phone calls.

The first phone call from October 28th, that's the phone call two days before the sentencing last Friday, and on this phone call -- let's talk about how it starts, okay?

At the beginning of the phone call Mr. Matthews is being informed and has learned that his only friends are not going to be at his sentencing and that upsets him, right, because

now he's saying, you know, my family will be here, but my only friends I have are not going to come. That's how the phone call starts.

And then he expresses, well, I hope the hearing gets cancelled, right, because remember Hurricane, I think, Zeta -- we've had so many of them, I might get the name wrong. But Hurricane Zeta was coming and he says, well, maybe that will cause the hearing to be postponed so then maybe one of his friends could come, right?

And then they talk about the time, and here's what happens in my view, okay? Mr. Matthews says, I guess I'm going to get like 15 years, and his mom wisely, like a parent, says, well, you might get more and you need to be prepared for that, and his response to being told that he might get 30 years, right -- and he knows 30 years is what Mr. Walker is asking for because I had already told him that before that phone call. And so his response is to make what I think is a joke, right? He says, well, if I get 30, I'm escaping some way or another, okay, and he uses the "F" word.

And then he says this. He says, you're going to have to come to New Orleans and visit Pablo, ugh, Pablo, ugh Pablo -- well, wait a minute. There's some Spanish here. And then he looks at a poster on the wall in his cell that has some Spanish language at the bottom and he reads the word "sentencia," right, which is the Spanish word for judgment, okay? So he makes that

up. He says, I'm going to be Pablo Sentencia and you'll have to come visit me in New Orleans. And the mom says, okay, well, I guess I'll start calling you Pablo, and then they move on, right?

This is what I heard, Your Honor, when I listened to him say that, okay? I am in the business of telling people bad news, and I have often sat with clients and told them the realistic possibility that they will spend decades in prison and I get these responses, right? People will say, well, then you might as well just kill me or everybody I love will be dead if I serve that much time. What's the point, right? Or if it's that much time, it's just a death sentence. I'll just die in prison.

People say things. People that accept the reality of what's happening later, that's a reaction. That's a way to stop talking about horrible news, okay?

And so if we look at what Dr. Kelley said, Dr. Kelley said that Holden Matthews has the intellect, social, and emotional development of an adolescent, an adolescent, like a 14-year-old. So what would a 14-year-old do when their parent in their only phone call of the day brings up the bad news? You make light of it, you make a joke, and then you change the subject and he did. As soon as he talked about the escape, he started talking about the Spanish words on the poster and never again did anybody talk about escape.

Your Honor, I submit that's an off-color joke. He shouldn't have said "escape." You can't say "escape" in a

prison. You can't say "bomb" in an airport. But when we look at the context, there's no evidence he's trying to escape. He's been in three different facilities for a year and a half. He has never tried to escape. He has never been written up. He has been a model inmate. There's no evidence that he's planning an escape. There's certainly no evidence that his parents would help him escape. Remember, in this case his parents turned him in, okay?

And then not only that, if we look at -- if we look at his full time that he's been in custody, right, he's learned that those phone calls are recorded. If you really want to plan to escape, you don't say it on the recorded phone call, right? So all of that shows the Court that that escape joke was off-color, right, but it's not -- it shouldn't be taken by the Court as him attempting to escape from prison. So, Your Honor, I don't think that statement should factor into the Court's decision today. That's the first phone call, but the first phone call being flagged has led the prosecutor to introduce two subsequent phone calls. So let's talk about those.

The second phone call is the very next day. So now we're October 29th. Now we are the day before the sentencing. This is last Thursday. And there's this 50-minute phone call, and on the phone call it begins with Holden trying to get the answer to a question from his parents, okay? And what he's trying to get the answer to is Holden believed that last Friday

he was going to be brought to state court after Your Honor was done sentencing him and Holden wanted to know if he was going to stay in St. Landry Parish at the state court or would he come back to LPCC last Friday immediately after the sentencing, but instead his parents have answered a different question and his dad has looked into the trustee programs that exist in St. Landry Parish under the sheriff's office.

And the parents, Your Honor, on this phone call I think are trying desperately to convince Holden Matthews that he should want to serve his DOC time in St. Landry Parish. And his dad is like doing a sales job, like, hey, if you stay in St. Landry Parish, you could be a trustee. You could be a trustee in this program called Cops and Kids, right?

Cops and Kids is a camp that is run by the sheriff's office that has a camp out by Washington, Louisiana, and there are a series of trustees from the St. Landry Parish jail that maintain that camp. So they go out and cut firewood, clear the trails, and when the kids go out there with the sheriff's deputies, if they shoot a deer or kill squirrels, the inmates will help dress and prepare that meat.

And what Mr. Matthews is trying to sell Holden is that, hey, that might be good for you, right? One, you do get to get out of the jail during the day, but some manual labor and some hard work will be good for you. That's the kind of man Mr. Matthews is, right, but also there's a chance for mentorship,

right?

So some of the youth that go through the Cops and Kids program are high-risk youth or troubled youth. So Holden might be a good person to mentor those kids and explain to them what not to do, right, to explain the mistakes he made, the situation he's in, and tell these at-risk youth, hey, if you're feeling depression, if you're feeling isolated like I did, ask for help from professionals, right? That's what Holden Matthews' dad was telling him on that phone call, right?

And this is Louisiana and it is a good ole' boy system and the sheriffs control a lot of how DOC inmates serve their time, and Holden's dad is trying to convince him that he should take advantage of the St. Landry stuff, but here's what's important to the Court today. Holden Matthews doesn't want that. He says on the phone call repeatedly, I don't want to go to St. Landry Parish. I was there. It was terrible. I want to go to DOC. What he means is he wants to go to Hunt. He wants to go to a prison and not a local jail, and he says why on the phone call. He says, dad, there's no classes at St. Landry. I want classes. I want to make something of myself. I want to learn something. If you go to St. Landry Parish for your whole sentence, you're not going to learn anything. So he wants classes.

They talk about him getting medicine and getting mental help and getting medical help, and he says, there's one nurse in

St. Landry. She's not helpful. So he doesn't even -- he doesn't even want to take up his parents' offer to try to help him.

So from the Court's perspective for today, if the determination is whether he has accepted responsibility, he didn't ask for his parents to look into the trustee program and he doesn't want -- he doesn't want to go to St. Landry.

And here's what I heard when I heard him talk about DOC. You know where he got the information about programming, mental health, medical health, classes, vocational training in DOC? It was from me and my paralegal, right?

We understand this system and we have been counseling Mr. Matthews, as we do all of our clients, with the fact that it's better, if they're going to serve a long term in DOC, to go to a prison instead of a local jail. And Holden Matthews said some of the exact things I told him on that phone call. He says, jails aren't made for long stays. I need to go to prison that's set up for a long stay, right, and that's important.

Mr. Walker makes a big deal about him wanting a mattress. Local jails don't have good mattresses. If you're going to sleep on a mattress for 15 or 20 years, you want to sleep on a better mattress. Prisons have facilities that are made for long-term stays. That's what Holden Matthews is saying, and yet his dad makes a joke about getting him a Serta or something like that, but, again, Holden Matthews wants to go to a facility that's set up for long-term stays.

And it is a joke where he wants to go to the Hilton, and the mom responds to the joke and says, we have like a Red Roof Inn in St. Landry. I mean, that's a joke. People joke when they are in high-stress situations and it's not appropriate probably and it certainly lacks color, but I think that's what's happening on this phone call.

So that second call, right, the call from October 29th, I don't think it shows Holden Matthews doesn't accept responsibility, okay, and he certainly is not asking for inappropriate or special treatment, even if his dad is lobbying him to try to do something like that, but we're not sentencing the father today, Your Honor. You're sentencing Holden and he didn't ask for those things.

So that brings me to the last phone call. And I disagree completely that Holden Matthews was asking his mom to faint. That's not what happened on that phone call. On the phone call he's talking about his dad looking like he had a red face, like he was upset in court, and then he says to his mom, and you fainted, right, and she says, I was trying not to, and then he says, well, you're going to have to do it all over again on Monday. The "all over again" is the hearing. So she fainted and she said she's trying not to, and he's saying, well, you know you've got to make it through this thing again. You have to make it through another hearing without fainting. He's not asking her to faint.

Holden Matthews gains nothing from disruption in the court today. If Holden Matthews wanted to disrupt the Court, he would disrupt it, right, but he's not. He's been nothing but polite and quiet and respectful every time he has appeared in court before Your Honor or the state court or the federal magistrate.

So then Mr. Walker talked about the later parts of the phone call from after court on Friday, and that's the -- that's the part of the phone call that I do find the most difficult to listen to, but, again, what I said at the beginning is this is Mr. Matthews getting back to the jail after his sentencing got continued and he's frustrated. He's very upset that there's an implication that he's some sort of escape risk, because as he says repeatedly on the October 30th call, he was just joking. It was a joke. He shouldn't have said it, but it was just a joke, but then he's frustrated. He's upset with some things he saw at the hearing. And who wouldn't be, you know. His literal freedom and life are at stake in this hearing.

And he's upset and he says not nice things about some of the witnesses that happened on Friday, and he's really upset because -- and this hasn't been said yet, right, but he's going to talk about it in a few minutes, but Holden Matthews is a Christian.

After these churches -- after he burned these churches and after he went to jail for this, he met with ministers in

St. Landry Parish and in Lafayette Parish, and with the help of his parents, he has returned to God, okay? And he has been devout for the past year or so.

And so what he was expressing frustration about in the phone call was that, you know, he had some disagreements on interpretations of some of the scripture that was said, right? So he was saying, you know, you don't get to say that the scripture says this. And, you know, Holden was like the scripture is the scripture, like that, you know. He's trying to work off their forgiveness, and he was frustrated because he felt like he didn't see some of the things that he wanted to see there. He has no right to do that. He has no right to expect anything from the victims in this case, the pastors and the parishioners. So that's inappropriate that he said that, but, again, we are listening to the only conversation he gets to have that day, right, where he can try to process what he just witnessed in court.

And so, Your Honor, I'd ask that you keep that in mind when you consider what weight that has, but I don't think anything in those phone calls says that Holden Matthews doesn't accept responsibility. Holden Matthews has accepted responsibility throughout this case. Holden Matthews pled guilty in this case to serious charges that carry mandatory minimum prison terms.

Holden Matthews met with the agents and the prosecutors

in this case and answered all of their questions, okay? Holden Matthews didn't fight over any restitution amount. He has accepted complete responsibility for his actions in his case. So I don't think those phone calls change that calculus.

So, Your Honor, the government is asking for 30 years and we're asking for 10 years and a day and that's a big difference, okay? The guidelines range before the Court is 70 to 87 months on Counts 1, 3, and 5 and then 120 months consecutive on Count 2. So you have to give 10 years on Count 2. The question is what do you do with the remaining counts? The guidelines are 70 to 87 months. We're asking for a day and the government wants you to triple that guideline range and give 20 years consecutive on those remaining counts. So 10 years and a day is an appropriate sentence considering the 3553(a) factors.

I live in Lafayette and I remember a year and a half ago seeing on the news that a church had been burned in Opelousas, and then I remember seeing a second one and that both of these were historical black churches, and then I remember seeing that a third church burned, and what I thought is exactly what one of the parishioners said on Friday. I thought this was probably a group of KKK members or white supremacists. You know, I shouldn't jump to conclusions, but that's what I thought, you know.

Then Holden Matthews was arrested and I saw his mugshot in the news, long hair, pimple face, menacing. I saw that

mugshot and it fit what I thought in my head, right? I saw that shot and I said that is like some white supremacist guy. How horrible.

And then I get appointed to represent Mr. Matthews and I drive to Opelousas to meet him, you know, and it's my job to go in with an open mind. So I walked in honestly expecting to meet a menacing, white supremacist and I met a terrified, scared young man who was immensely remorseful, who was upset that the media had portrayed him as racist because he says he's not racist, like he had no -- there was no -- he didn't know the makeup of the congregations of the churches.

And he was distraught because he was coming to terms by watching the news at how horrible his actions had affected the congregation members. He saw the news reports of the pastors speaking and the parishioners speaking and it tore him up. And he wanted at that very first hearing to go meet the pastors and just like throw himself at their mercy and tell them he was sorry, right, and our system of justice doesn't really let that happen, you know, but I walked out of that first hearing a year and a half ago completely taken aback at what I had seen.

THE COURT: Let me ask you, that first fire at St. Mary Baptist Church, in the PSR there were Facebook messages after that fire that seemed to reference media coverage from KATC. So he was aware of that media coverage and what was in that media coverage before he proceeded to the next two churches.

MR. TALBOT: That's correct. I don't want to say the wrong thing. I don't know if it was the first or second church, but certainly there was media coverage that he posted in a Facebook message to another black metal member prior to the third church.

THE COURT: So he wasn't ignorant of the media coverage that would indicate what happened to these churches until he was incarcerated.

MR. TALBOT: That's correct, Your Honor.

So he was aware of the media coverage and he -- in the Facebook message where he posted the media coverage, I think he took like a screenshot picture of a news report and sent that screenshot. And he was upset because the news media was claiming that there was some racist act and he was upset that the news media was saying it was -- there was racist intent. Instead it was a religious thing. He was burning churches irrespective of the race of the congregations of the church.

But you are correct, Your Honor. I'm not saying that he was ignorant of all media coverage. What I'm saying is when he sobered up and in jail and watches the media coverage, it truly dawned on him the consequences of his actions and what -- and the harm his actions had caused, right, because Mr. Matthews, as explained in my sentencing memo, you know, he never intended to hurt people, right? He burned these churches at night. They were in rural areas. He took his actions, as misguided and

horrible as they were, in an attempt not to harm people, just to harm property because he wanted to take a photograph and document a church burning and use it as the cover art for an album just like Varg Vikernes did in Norway.

And not just that, right? Not just the notoriety of the album cover, but also the notoriety of burning the churches, right, which is how Varg Vikernes made his name in black metal.

So, Your Honor, when he gets to jail and he is sober and he is -- two things I think happened when he got to jail. One, in a sober mind he could see the aftermath of his actions, and the way he tells me, right -- because he would see the parishioners talk about how much the building meant to them and that he hadn't really thought about that, right? He hadn't considered that consequence.

THE COURT: Let me ask you -- and I apologize for continuing to interrupt you.

MR. TALBOT: No problem.

THE COURT: But I want to give you the opportunity to address just some of what's in the record.

At one point in the PSR -- this is the same Facebook message group -- he states that he wanted the parishioners to be scared. You said, you know, that he didn't intend physical harm, but there is that in the messages that he wanted to make them scared, which that's more than getting cover artwork on an album.

And that was just something that I noted on the PSR and

I want you to be able to explain that since it's forefront in my mind, that comment that he made about wanting to instill fear or to scare them.

MR. TALBOT: Yes, Your Honor. Please ask any question you'd like.

That's a very good point. He's imitating Varg Vikernes when he makes those statements, right? So the thing that Varg Vikernes did is when he would take credit for the burning of the churches in the black metal community, he would use language like that, right? He would say like the goal is to stop the oppression of, you know, of Christianity and these other kind of pagan, Odinist, anti-Christian mantras that are reeled across the black metal scene.

So he's in that persona. He's trying to say the right things to imitate Varg. So that way the black metal internet community would accept him. And, again, that's the whole goal here, right? His goal is to be accepted in this online community.

And so that imitation, Your Honor, I think it's important to talk about, you know, what Dr. Kelley says about Holden Matthews, that, again, he's got the intellect and the social and emotional, you know, maturity of an adolescent. So that's who's making those statements, right? You know, that's who could think that making those statements would make you accepted in a certain community.

And so when I left the jail, the first thing I did, Your Honor, after meeting him, is I hired Dr. Kelley, and I set out to answer two questions to answer to the Court today, right? I wanted to know why he did it, and that gets a little bit to the questions you just asked, and I wanted to know if there is a concern that he would do this again, okay?

So I hired Dr. Kelley, and we heard her testimony and, Your Honor, you've read her record, but I want to talk about what she said on Friday, okay?

Now, Mr. Walker obviously disagrees with Dr. Kelley, right? He thinks that she should have said that Holden Matthews has a lot or all of the sociopath traits, and Luke Walker went through each individual trait and cherry-picked a fact from the offense and had Dr. Kelley address whether that sole fact in a vacuum would meet that trait. That's not how this works. That's not how sociopathy works, right?

Every person during the commission of a crime is exhibiting sociopathic traits. That's how you commit a crime, right? You show those traits. The question about whether someone is a sociopath, in other words, they lack empathy, they lack a conscience, they don't have the ability to correct their actions, that is based on not just what happens in a crime, but what has happened before and after, and that's what Dr. Kelley kept trying to tell Mr. Walker yesterday was that Holden Matthews does not exhibit the signs of a sociopath. He didn't in her

interview with him and he doesn't in his social history from before the crimes and after.

And so I understand why Mr. Walker pushed so hard on that point, right, because Mr. Walker wants the sociopath issue out there, right, because as Dr. Kelley admitted, a true sociopath is kind of like without redemption, right, and there would be a concern about recidivism, but a true sociopath wouldn't show empathy, wouldn't have blown me away with empathy when I first met them a year and a half ago, and wouldn't have convinced Dr. Kelley about that, right?

Dr. Kelley is qualified to give the opinion of whether Holden Matthews is a sociopath and whether he shows empathy. We know she's qualified because Luke Walker stipulated to it. He stopped me when I was questioning and said, I agree she's an expert, I agree she's qualified, and she gave her opinion, okay?

And then she said something else on the stand, right? Luke Walker had her admit that she provided him all of her raw data. Why is that important? Because where is his expert? He could have taken her raw data -- if he thinks she did such a bad job in her conclusion, he could have taken her raw data and called his own psychologist up here to say she did something wrong, but he didn't because her opinion is correct, because she is qualified in her field and she's a professor at LSU. She supervises and teaches other people how to do clinical psychology, and she also does active clinical psychology and sees

patients herself.

So when she testifies that what few traits Holden Matthews shows about recidivism, right, the drinking, the substance abuse, which is marijuana in this case, his isolation, his social anxiety, when she says those are treatable, that you can address those factors with therapy and counseling and perhaps medical intervention, right, then that lowers his risk of recidivism. She's giving an expert opinion based on 30-plus years of experience dealing with only young adults, adolescents, and kids, right, which is what we're dealing with with Mr. Matthews. So there's no dualing expert here, right, and the only expert opinion provided is the right opinion.

So the other thing that I learned from Dr. Kelley, right, is that if Holden Matthews has the intellectual and social and emotional ability of an adolescent, what does that tell us from the law, right?

So if we look at the Supreme Court over the past ten years, we have several cases about juvenile brains and about what sorts of sentences should be imposed on juveniles.

Holden Matthews is not a juvenile under the law, right? So he doesn't get those benefits, but what all those cases, *Miller* and *Graham* and all, have told us is that the young brain is different, right? It doesn't make decisions as well. It doesn't truly apprehend -- or comprehend the consequences of actions as well as full grown adults do. So what Dr. Kelley is

telling us is that's what we're dealing with here.

So when I see this and I see, okay, Holden Matthews believed that if he burned some churches, that he would be accepted into this black metal online group of people, that sounds absurd to me, but then I think about what if a 14-year-old thought that. And now I'm getting there, right? I could see how someone with an adolescent mentality, a low intellect, right, an 81 IQ, might believe something, might believe that their actions could garner them some sort of acceptance into this group, acceptance into a group that he's never been accepted into before. So, Your Honor, that's what I learned.

And with what Dr. Kelley says and understanding that he had watched this movie *Lords of Chaos* with his father, his father who was disgusted by the movie, if we look at his actions, it's like the *Lords of Chaos* movie is a blueprint. And the *Lords of Chaos* movie is a really active portrayal of Varg Vikernes' life, right?

What happened is Varg Vikernes was an outcast, was not accepted into the community until he burned a historical church in Norway, and he used the photograph of that church on his album, and then the black metal community, as twisted as all of this sounds, accepted him and he became really famous in that community. And that *Lords of Chaos* movie is a really dramatic telling of that exact thing, and not several months later that's what Holden Matthews does, right? He burns churches. He puts it

on his album cover. He says the things -- as Your Honor pointed out, this community is making the statements -- in trying to make a name for himself, okay?

And that brings me to the second question which is, is there concern that he might do this again? And, Your Honor, this may be the most important thing I say today. He won't do it again, and here's why I know.

When he was arrested, he could have at that moment gained everything he wanted, right? At that moment it was international news that he had been arrested for the burning of the churches and that's the moment Varg Vikernes got famous, right? That's the moment Holden Matthews could have capitalized on the fame and he didn't, okay?

I fielded more press, phone calls, and requests in this case than my last ten years combined, and Holden Matthews didn't take up one offer to do an interview with these underground metal magazines and these blogs and all these things that are associated with this underground music community. He didn't do any of that. And this is what someone who's going to recidivate would do. He could have used it as a call to action. He could have done an interview and said, hey, I burned all these churches. I'm famous. Go download my music. He could have done this as a call to action to gain the infamy that his adolescent brain wanted him to get when he was drinking and burning these churches and saying these things, but when he sobered up and he

saw the harm that he had caused these congregations, he didn't do any of that. Instead, instead of capitalizing on that fame and achieving all of that, he was remorseful. He was broken. He re-evaluated his faith, right? And he pled guilty. He cooperated and subjected himself to interviews from the agents and the prosecutors.

He did everything to try to make amends. He begged to meet the pastors and to apologize. That's what he did instead of gaining the infamy that he was seeking at the beginning, and that is so telling to me, right? That tells me that he wasn't seeking that, that he learned, right? He realized that these aren't just buildings, that there is real harm, right, and that a lot of the destruction he caused is irreplaceable, and that destroys him because he can't rebuild something that's unbuildable, something that can't be replaced. He can just work to try to make amends in whichever way he can, but that is what's so important to me.

And so Luke Walker talked about the need to provide adequate deterrence to similar crimes. That's the adequate deterrence. He didn't seek any of the fame that he could have gotten here, right? So that's what's different.

When the prosecutor talks about -- when Mr. Walker talks about 30 years, that's for that guy, right? Thirty years maybe would be appropriate if that's what Holden Matthews has done, if he's unapologetic, if he seized on the infamy and did a call to action. If he was this remorseless person that used this

to his advantage, then maybe 30 years is appropriate because that person is probably beyond redemption, but that's not what we have here, you know, and that's why a downward departure from the guidelines is appropriate.

The other reason why I think the Court shouldn't be concerned that he would do it again, right, is Dr. Kelley's prognosis, right? So what she's done is she has reviewed the literature on recidivism, okay?

Again, Mr. Walker didn't provide an expert on recidivism, okay, but Dr. Kelley reviewed the literature on recidivism and applied it to Holden's case, and she has so much integrity that she acknowledged off the bat that the literature disagrees with each other. And in the report she talked about one of the papers and its recidivism rate on Holden Matthews, but that there are other papers where recidivism is higher. So she acknowledged that, that it's kind of all over the place, but the recidivism factors he has can be treated. That's what Dr. Kelley says and that's another reason I think that the risk of recidivism is low in this case and that's why that shouldn't be a reason for the Court to upward depart.

So, finally, I want to talk about 30 years. The guideline for second degree murder is not 30 years. The guideline for armed robbery of a bank with a gun is not 30 years. The guideline in this case is 70 to 87 months. There's a reason for that guideline, okay?

And Mr. Walker said, you know what? His guideline will be the same if instead of these beautiful historic churches that were destroyed, he had destroyed a double-wide trailer church, and he's right, but you know, the guideline would also be the same, Your Honor, if he had capitalized on all his fame and had gone and given these interviews and asked people to download all his music and if he had tried to capitalize on this. The guidelines would be the same.

THE COURT: Just to be accurate, you said 70 to 87. That doesn't count the consecutive -- mandatory consecutive sentence of 120.

MR. TALBOT: That's correct, Your Honor.

THE COURT: So the guidelines really -- you know, what you're requesting is that mandatory consecutive plus a month on the consecutive sentences.

MR. TALBOT: Yes, Your Honor.

We're asking for 120 months on Count 2, which is the mandatory ten-year consecutive, and then we're asking for one day on the remaining three counts concurrent for a total sentence of 120 months and one day.

THE COURT: The guidelines are -- the top end of the guidelines is 17 years, which is in itself a significant amount of time in federal prison. They're asking for an additional 13 years. So I want to calibrate. The guidelines, if we factor in that consecutive sentence, and it's always hard to do math on the

fly, but it's about 15, 16 years to just over 17 years. So when we calibrate that sentencing guideline range, that's further up from that ten years. So I just -- I just want to make sure that we're all on the same page.

MR. TALBOT: That's correct, Your Honor.

We are asking for a downward departure or variance from the guidelines. Essentially you would be departing downward from 70 months to one day is what we're asking for on Counts 1, 3, and 5. You have to do 120 months on Count 2 consecutive no matter what. So we're asking for a departure downward from 70 months to one day.

And, Your Honor, there is a Supreme Court case called *Dean* that came out in 2017, and *Dean* says that when the Court is in the situation it is here today where you have a mandatory consecutive count and then you have an additional count that has a guideline range, that it's okay for the Court to consider the ten years in determining what the appropriate overall sentence is.

THE COURT: Based on the 3553 factors.

MR. TALBOT: That's correct, Your Honor.

And in that case that judge actually, I think, wanted to give ten years and a day, and the question was was it appropriate to only give a day on the remaining counts and it was because he was allowed to consider that he had to give ten years on a different count. So we're kind of asking for that same

thing here today. And so although we're asking for a day on Counts 1, 3, and 5, really it's a ten-year and a day sentence in total and the Court can consider that total number.

So, Your Honor, 30 years is an extraordinary amount of time in federal prison. In federal prison there's no parole, which means Holden Matthews won't be released early from 30 years. There is good time credit, right, which means that if he stays out of trouble, as he has done so far, in prison, he could get up to 15 percent off of his sentence, right? He has to serve 85 percent.

There's a different thing under the First Step Act called time credits. He's not eligible for those because Count 2 is a violent offense and Count 2 makes him ineligible under the First Step Act. So he has to serve 85 percent of the sentence.

So when the government says 30 years, that doesn't mean he only has to serve half or he could show that he's, you know, completely rehabilitated in ten years and ask for parole or something. He can't do any of that. Thirty years is 30 years if the Court imposes that.

And, Your Honor, if you impose the sentence we're requesting, there's a term of supervised release afterwards. So there is a period where the Court will know if Holden Matthews is reformed, and if he's not, he goes back to prison, you know. So, Your Honor, there is a mechanism there to help make sure that he's reformed.

And we know that he wants that because you heard the phone call where he's turning down the trustee position and saying, I need to go to prison and get classes and programming, right, and work more on my faith and figure out how to work for forgiveness in this case and figure out how to start to make amends for the harm that he caused to the pastors and the congregation members and their communities.

So, Your Honor, the final thing that we will ask for today, and I know we've discussed this in the back, is whatever sentence the Court imposes, we would ask that the Court order that there is no credit for time served prior to today, but that the sentence commences today.

And then whatever sentence the Court impose, we would ask that you adjust it downward by 18 months and 24 days. That's the amount of time he's already served. I know we had talked about 21 days, I think, on Friday.

THE COURT: I think we ran it up to 18 months. I thought it was 18 months that we settled on.

MR. TALBOT: Right, yeah.

THE COURT: It's kind of difficult to do it by day.

MR. TALBOT: Yeah. I understand.

Whatever the Court thinks is appropriate with that. He has served 18 months and 24 days as of today.

And so, Your Honor, with that, Mr. Matthews is looking forward to addressing the Court and the congregation members that

are here and that are watching on the video.

THE COURT: Thank you, Mr. Talbot.

At this point, as part of these proceedings, the defendant has a right to allocute, in other words, the defendant has a right to address the Court, speak to the Court and address the Court as far as his sentence and any factors the Court should consider in mitigation of that sentence.

So, Mr. Matthews, at this point you may address the Court.

MR. TALBOT: Your Honor, would you like him to do it from the table?

THE COURT: Let's do it from the table.

THE DEFENDANT: Your Honor, what else can I say other than sorry. There's not a word in the English language to describe how sorry I am. I destroyed years of history and personal memories just because I wanted to fit in with morons with guitars in the heavy metal scene.

If I could go back and change it all, I would. Given the chance to rebuild each with my bare hands brick by brick, I would. Many of the church members showed concern about me finding the Lord and it has already happened. I was pagan for a while, but that along with the arsons themselves were just foolish imitations of Varg Vikernes, the black metal musician, but I have found my faith in the Lord. One church member said that I was used by the devil and she couldn't have been more

correct.

Your Honor, I beg that you be as lenient as possible so I can have a second chance at life to do good and to have a life of men. I'll humbly accept whatever you see fit, because as the prophet, Jeremiah, said in Lamentations 3:39, why should the living complain when punished for their sins, but as Paul wrote under the anointing of the Holy Spirit in Romans 8:28, we know that all things work together for those who love God, and in this I have hope.

Since coming to Christ, I have found peace beyond understanding, but along with it, the bitter taste of my actions are made that much worse because I not only have hurt my real family and friends, but I have also hurt my brothers and sisters in Christ Jesus, and I very much hope that they forgive me.

THE COURT: Thank you.

Mr. Walker, did you have -- does the government have anything else?

MR. WALKER: No, Your Honor, unless the Court has questions.

THE COURT: I don't have questions.

Mr. Talbot, do you have anything else?

MR. TALBOT: No, Your Honor. Thank you.

THE COURT: Okay. You know, up until this point, the parties and the defendant have had an opportunity to speak, and as you'll note, the Court has had very little to say. That's the

role of the Court and now this is the Court's role to pronounce sentence.

Before doing that, as I stated on the record on Friday, having gone through the guideline calculations and having considered those guideline factors, which the Court must do, the Court also has to consider the factors under 3553(a), and on Friday I listed those factors. Those are the statutory factors that I have to consider.

Mr. Matthews, Section 3553(a), for example, requires me to consider the need that my sentence reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. It also requires me to consider the nature of the offense.

I cannot, sitting here, overemphasize the seriousness of these crimes. These crimes devastated three church communities, congregations that have roots going back over a century. We are fortunate that no one was injured as a result of your actions, but these crimes are more than the crime of an arsonist taking away the property of somebody else. To these church communities, their churches were not just places to worship on Sunday. They are social and spiritual centers. They are the social and spiritual centers of their communities. They are their history.

Section 3553(a), if that were the only factor that the Court would consider, the nature of these offenses would call for

significant punishment, but 3553(a) also requires me to consider the history and characteristics of the defendant.

So that's where I have to consider you. I have to consider, you know, who you are, what you've done, your history, your background, and all of that is reflected in the Court's findings contained in the presentence investigation report, as well as the letters that have been submitted to the Court, the sentencing memoranda, and the record as a whole.

I've considered your background. In considering your background, I'm sympathetic with the struggles that you've had over the years, and that in wanting to fit in, you became involved in a group and an ideology that led you to this place, but actions have consequences. The actions here were not impulsive. I think the government makes a point of that. The actions were not impulsive. They were planned.

When you set fire to St. Mary Baptist Church on March 26th, 2019, you saw the consequences of that fire. You saw the news reports. It's all reflected in the record. And yet over the course of the next week, you destroyed Greater Union and Mount Pleasant in Facebook messages. And I asked your counsel about this, to address it. In Facebook messages you stated that you wanted them to be scared.

You know, the record reflects that these fires were not the act of somebody who was setting them on account of race. Race didn't motivate you. I understand what motivated you was

hate for religion, but the Court does have to consider, you know, the impact of these crimes in terrorizing these communities, that these fires recall a very dark time in our history, history that magnified that fear, the fear that you said you wanted to inflict. You wanted to make them scared.

Fortunately, I have to consider all the 3553 factors. If I were to focus on the severity of this crime and the impact alone, I would not be considering the 3553(a) factors.

Mr. Matthews, please stand.

Mr. Matthews, I hereby commit you to the custody of the Bureau of Prisons for a term of 180 months as to Counts 1, 3, and 5 to run concurrently and a term of 120 months as to Count 2. That 120 months as to Count 2 will run consecutively for a total sentence of 300 months.

In order to give the defendant proper credit for the time he has already served in custody, the Court will reduce the sentence by 18 months for a total sentence of 282 months. That 282 months is to run concurrently with the pending state court charges.

This is not a guideline sentence. This is in excess of the guidelines, and having considered the factors under 3553(a), I conclude that a variance upward from the sentencing guidelines is appropriate.

I understand the 30 years asked for by the government, but part of this is is this person irredeemable. A 30-year

sentence puts this defendant in prison until he's 50. The present sentence is not an insignificant sentence. It is 25 years minus the 18 months, the 18 months that he has already served in custody. So that's a total -- when you add the time that he served to what I am imposing, that's a 25-year sentence.

I hereby order that Mr. Matthews be placed in a facility as close to his family as possible. His family lives in St. Landry Parish. I recommend to BOP that he receive substance abuse treatment, including the RDAP program, mental health counseling.

And are there any other requests that Mr. Matthews makes as far as his placement in a facility?

MR. TALBOT: No, Your Honor.

THE COURT: Upon release from imprisonment, the defendant is to be placed in a supervised -- be placed on supervised release for a term of three years per count to run concurrently.

While on supervised release, the defendant shall comply with the standard conditions of supervision as adopted by this Court and the following mandatory conditions:

You must not commit another federal, state, or local crime.

You must not unlawfully possess a controlled substance. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from

imprisonment and at least two periodic drug tests thereafter as determined by the Court.

You must make restitution in the following amounts:

For the damages to St. Mary Baptist Church, the total sum of $590,246 with $575,000 to be paid to GuideOne Insurance and $15,246 to be paid to St. Mary Baptist Church.

For the damages to Greater Union Baptist Church, the total sum of $970,213.30 with $200,000 to be paid to GuideOne Insurance and $770,213.30 to be paid to Greater Union Baptist Church.

For the damages to Mount Pleasant Baptist Church, the total sum of $1,100,000 with $254,329 to be paid to AmTrust North America Insurance and $845,671 to be paid to Mount Pleasant Baptist Church.

Mr. Matthews, you must cooperate in the collection of DNA as directed by the probation officer.

Additionally, the defendant shall comply with the following special conditions of supervised release:

The defendant shall participate in substance abuse testing and/or treatment, inpatient or outpatient, as administered and approved by the United States Probation Office and shall contribute to the cost of such testing and treatment in accordance with his ability to pay. The defendant shall also refrain from alcohol use while in a substance abuse treatment program.

The defendant shall participate in a mental health treatment program as approved by the United States Probation Office and shall contribute to the cost of treatment if financially able.

Restitution is mandatory per statute and guidelines and I've ordered restitution. The restitution that I ordered shall be payable to the United States Clerk of Court and be disbursed as stated above. Upon release from imprisonment, payment of the balance owed towards restitution shall become a special condition of supervised release.

The Court is imposing no fine in this case due to the defendant's lack of assets to pay a fine in addition to restitution.

It is ordered that the defendant pay to the United States a special assessment in the amount of $400.

The Court notes that it would impose this sentence even if the Court has in some way erred in calculating the applicable guidelines range based on all the information presented to the Court in this proceeding.

Mr. Matthews, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there is some other fundamental defect in the proceedings that was not waived by your guilty plea.

Any notice of appeal must be filed within 14 days of the entry of judgment or within 14 days of the filing of a notice

of appeal by the government.

If requested, the clerk will prepare and file a notice of appeal on your behalf. If you cannot afford to pay the cost of an appeal or for appellate counsel, you have the right to apply for leave to appeal in forma pauperis, which means you can apply to have the Court waive the filing fee. On appeal, you may also apply for court-appointed counsel.

Are there any other matters necessary to resolve this case?

MR. WALKER: Your Honor, at this time the United States would move to dismiss Counts 4 and 6 of the indictment.

THE COURT: That's granted.

The defendant is hereby remanded to the custody of the United States Marshal to begin service of sentence.

MR. TALBOT: Your Honor, I do want to lodge an objection.

THE COURT: Your objection is noted.

MR. TALBOT: Thank you, Your Honor.

Can I provide a specific objection just for Fifth Circuit purposes?

THE COURT: You may. You may proceed.

MR. TALBOT: Thank you, Your Honor.

I would like to object to the sentence imposed as being greater than necessary under the 3553(a) factors. I'd also like to specifically object to the Court's statement that the sentence

would be imposed the same, I guess, if there was some sort of guideline error or legal error.

And, Your Honor, the basis -- unfortunately the Fifth Circuit makes me be very specific, Your Honor, but the basis for that objection is that I think if there were some sort of error today, perhaps the calculus could be different, and I just want to lodge that objection.

THE COURT: That objection is noted.

MR. TALBOT: Thank you, Your Honor.

THE COURT: Anything else?

MR. WALKER: No, Your Honor.

THE COURT: We're adjourned.

(Court Adjourned)

\- - -

Certificate

I hereby certify this 12th day of July, 2023, that the foregoing is, to the best of my ability and understanding, a true and correct transcript from the record of proceedings in the above-entitled matter.

*/s/ LaRae E. Bourque*

Federal Official Court Reporter